UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK BOOTH,

     Plaintiff,

                          Case No. 18-13739

v.

                          Hon. George Caram Steeh

ORION TOWNSHIP, a municipal
Corporation, and DAVID GOODLOE,
in his individual capacity,

     Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 21)

Defendants seek dismissal of Plaintiff's discrimination complaint. The court heard oral argument on February 6, 2020, and took the matter under advisement. For the reasons explained below, Defendants' motion is granted.

## BACKGROUND FACTS

Plaintiff Mark Booth alleges that Defendants Orion Township and David Goodloe discriminated against him on the basis of his race when the township did not renew his contract. Booth was an independent contractor who served as a mechanical inspector for the township beginning in 2013.

-1-

He is of Mexican Apache heritage, although his last name does not reflect that background because he was adopted by his stepfather.

Goodloe was hired as the township Building Official in September 2016.  As the Building Official, Goodloe was responsible for managing the Building Department, including deciding whether to renew the contracts of the mechanical, plumbing, electrical inspectors, which were for the term of one year.  According to Defendants, Goodloe was tasked with improving the customer service provided by the department.  ECF No. 21-3 at 25; ECF No. 21-4 at 17.

When Goodloe started in September 2016, he considered not renewing Booth's contract for 2017 based upon feedback from township employees.  *See* ECF 21-4 at 52-54.  Goodloe knew Booth from a previous job and found him to be "arrogant" and "difficult to deal with."  *Id.* at 9-11. Ultimately, Goodloe renewed Booth's contract because he intended to make policy changes and did not want to make "too many changes" at the beginning of his tenure.  *Id.* at 17.

Booth alleges that Goodloe made several derogatory comments regarding Mexicans to him during 2017.  According to Booth, Goodloe said "he didn't like the Hispanics."  ECF No. 21-2 at 60.  When pressed to elaborate on that conversation, however, Booth did not report Goodloe

using those words, but rather that he "didn't care for [the Mexicans'] work." *Id.* at 60-64. The conversation began when Booth commented about some drywallers: "these Mexicans do good work." *Id.* at 62-63. Booth alleges that Goodloe responded that "he didn't care for their work" and that "they caused him to lose money." *Id.*

On a different occasion, Goodloe pointed out a truck at a job site that was a lowrider. Booth alleges that Goodloe said that "I don't know how these Mexicans work out of a lowrider." *Id.* at 75.

On a third occasion, Booth claims that Goodloe turned off music played by Mexican workers at a construction site. According to Booth, Goodloe was "ranting and raving" about how "this is a horrible site" and "these guys are doing horrible work." ECF No. 21-2 at 81-87. The workers were listening to loud Tejano music. Goodloe turned off the music and said that the workers should be listening to rock and roll, "American music." Booth said, "you know, I'm Mexican" and "I like that kind of music." *Id.* at 86. Booth stated that Goodloe did not respond, but "his face went somber" and he "sulked." *Id.* Goodloe denies ever being on a job site with Booth, or making the comments about Mexicans that Booth ascribes to him. ECF No. 21-4 at 60.

Booth alleges that after he told Goodloe that he was Mexican, Goodloe was "distant" and avoided speaking to him. ECF No. 21-2 at 97-102. In November 2017, Booth asked Goodloe about his contract. Goodloe mentioned that he did not like the hours Booth was devoting to his Orion Township work and that Booth did not "fit into the culture of what he was trying to cultivate within his office." *Id.* at 93. Booth had "no clue what that meant" but found it "quite offensive" because he thought Goodloe was referring to "culture" as "somebody's heritage, somebody's history, how they live." *Id.* at 94. Goodloe testified that by "culture" he meant the "customer service culture" he was trying to develop in the Building Department. ECF No. 21-4 at 70.

Later in November 2017, Booth had a conversation about "work and plan reviews" with Goodloe. Booth testified that "in passing I mentioned that I didn't care for his conversations, his comments." ECF No. 21-2 at 150-56. Goodloe did not respond. *Id.*

In December 2017, Goodloe informed Booth that his contract would not be renewed. According to Goodloe, he had several issues with Booth's performance. Booth charged re-inspection fees at a higher rate than other inspectors, which Goodloe found to be contrary to the "customer friendly" policy he was attempting to implement. ECF No. 21-4 at 22-24. A re-

inspection fee is typically charged when a homeowner is not at home at the scheduled time, causing the inspector to have to return. *Id.* at 17-20. Goodloe asked inspectors "not to abuse the re-inspection fee," but Booth did not appear to comply. According to Goodloe, Booth would "re-fee any chance he could get." *Id.* at 23, 42-43.

Goodloe testified that Booth would arrive at an inspection before his scheduled time and when the homeowner was not there, he would charge a re-inspection fee. *Id.* at 30-32. Or Booth would knock and leave, not giving the homeowner a chance to answer the door. *Id.* at 30-35. Goodloe received approximately thirty calls from homeowners complaining about this practice. *Id.* The township supervisor, Chris Barnett, also received complaints about re-inspection fees from time to time. ECF No. 21-3 at 9-10. One of the other inspectors, Tom Katich, heard complaints from contractors about Booth's practice of charging re-inspection fees. ECF No. 21-6 at 6-8, 12.

Goodloe stated that Booth would not leave inspection notice stickers on job sites, as required by his contract. ECF No. 21-4 at 25-26, 34. According to Goodloe, Booth's inspection reports were riddled with grammar and spelling errors, which he felt reflected a lack of professionalism. *Id.* at 26-29. Goodloe also took issue with Booth's

"unpredictable" hours, particularly when Booth would arrive at a job site earlier than his scheduled time. *Id.* at 47-50. Goodloe testified that he had several conversations with Booth about his "customer service" before informing him in the fall of 2017 that he was not going to renew his contract. *Id.* at 67.

Booth contends that Goodloe never informed him of any customer complaints. ECF No. 21-2 at 19-20, 34-35. He claims that he always left inspection stickers as required. *Id.* at 19. Booth acknowledged that his re-inspection fee rate was "high" compared to other inspectors, but asserted that the reason was because he had "a lot more inspections than them." *Id.* at 91. Booth also acknowledged that Goodloe told him that he did not like the hours Booth was keeping. *Id.* at 93. Booth stated that one of the other inspectors, Bill Hyder, worked the same hours as he did. *Id.* at 93-95.

Goodloe testified that he also talked to Hyder about not renewing his contract in the fall of 2017. ECF No. 21-4 at 71-72. Hyder improved his performance by making an effort to be in the office more and his contract was ultimately renewed. *Id.*; ECF No. 21-3 at 22-24; ECF No. 21-7 at 12.

After his contract was not renewed, Booth sued Goodloe and Orion Township, alleging violations of 42 U.S.C. § 1981 and First Amendment retaliation. Goodloe replaced Booth with a white contractor, Brian Clacum.

<u>LAW AND ANALYSIS</u>

I.    <u>Claim under § 1981</u>

Plaintiff alleges race discrimination under 42 U.S.C. § 1981, which "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). To establish a claim for race discrimination under § 1981, a plaintiff must establish that "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Id.* When a plaintiff attempts to prove intentional discrimination through circumstantial evidence, courts follow the burden-shifting framework applied in cases arising under Title VII. *Id.*; *see also McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Booth does not claim that he has direct evidence of discrimination, and proceeds under the *McDonnell Douglas* analysis.

Under this framework, a plaintiff must establish a prima facie case of discrimination by showing that (1) he is a member of a protected group; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) he was replaced by a person outside the

protected class or treated differently than similarly situated non-protected employees. *Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Id.* If the defendant satisfies this burden, the plaintiff must then demonstrate that the employer's reason is pretextual, by showing that "(1) the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his] discharge, or (3) that they were insufficient to motivate discharge." *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1991)). Plaintiff retains the burden of producing "sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants 'intentionally discriminated' against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). "Accordingly, the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id. See also Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012).

The center of the dispute here is whether Defendants articulated a legitimate nondiscriminatory reason for not renewing his contract and whether Booth has demonstrated pretext. Plaintiff contends that Defendants have not presented evidence of his performance deficiencies. To the contrary, Defendants have relied upon the testimony of Goodloe, which was corroborated by Barnett and Katich. Further, Defendants' burden is one of "production, not of persuasion, and it does not involve a credibility assessment." *Upshaw .v Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). Defendants have offered a legitimate nondiscriminatory reason for not renewing Plaintiff's contract: he had performance issues, including charging excessive re-inspection fees.

Plaintiff argues that his performance was not deficient and claims pretext based on the following: (1) Goodloe did not inform Plaintiff of his performance issues, but told him that he did not "fit into the culture of what he was trying to cultivate with his office"; (2) Goodloe did not document the customer complaints, creating the "only logical inference" that they were manufactured; (3) documents evidencing Booth's grammatical errors were created after the fact; (4) Booth's contract was not renewed shortly after Booth informed Goodloe that he was Mexican; and (5) Goodloe was the

sole decisionmaker and could discriminate without being subject to "checks and balances."

Plaintiff's evidence of pretext is thin. It bears emphasizing that Plaintiff cannot establish pretext by merely denying that his performance was poor. Booth acknowledged that his re-inspection fee rate was higher than other inspectors and that Goodloe was unhappy with his schedule, thus precluding the argument that Goodloe's reasons were false.

Plaintiff suggests that the reasons provided by Goodloe here are inconsistent with what Goodloe told him – that he did not "fit into the culture" of the office. Given the ambiguity of this statement, however, it is not inconsistent with the specific reasons Defendants provided here. Goodloe was not required by policy or otherwise to elaborate on the reasons for not renewing Booth's contract; his failure to do so does not raise an inference of pretext. *See Hague v. Thompson Dist. Co.*, 436 F.3d 816, 827-28 (7th Cir. 2006) ("Although Thompson did not tell the plaintiffs the specific reasons they did not 'fit,' the fact that Thompson did not elaborate does not constitute evidence of pretext.").

Plaintiff also takes issue with Defendants' failure to provide documentation of customer complaints. Such a lack of documentation does not create an inference of pretext unless there is evidence that the

documentation should have been created, but was not. *See id.* at 827.

"This is because in complaining about the lack of documentation, the

plaintiffs are not really challenging the veracity of [defendant's] proffered

reason, but are rather attempting to impermissibly increase [defendant's]

burden from a burden of production to a burden of proof." *Id.* Plaintiff

provides no evidence that the township had a system or practice of

documenting customer complaints – or the deficiencies of an independent

contractor – during the relevant time period. *Cf. Burton v. Freescale*

*Semiconductor, Inc.*, 798 F.3d 222, 239-40 (5th Cir. 2015) (lack of

documentation of complaints created an inference of pretext when coupled

with evidence that documentation should exist). The township has since

put in place a system to log complaints, but that is of no assistance to

Booth.

Booth also argues that documentation showing the grammatical

errors in his reports was created after the fact. Defendants offered

printouts of a number of Booth's inspection reports for inspection dates in

2017. The top of each page is dated 06/26/19. Booth contends that this

date demonstrates that the documents were created after the fact.

Goodloe averred that the documents are public and business records that

were created by Plaintiff in the course of his duties and that are stored

electronically at the township.  ECF No. 26-3.  The 2019 date reflects the

date that the records, which were created in 2017, were printed for use in

this litigation.  *Id.*  Plaintiff does not rebut this evidence, nor does he deny

that he created the reports that are rife with grammatical and spelling

errors.  Plaintiff's bare allegation that these documents were created after

the fact neither bears scrutiny nor creates an inference of pretext.

Booth is left with the relatively short temporal proximity between the

time Booth informed Goodloe that he is Mexican and the time Goodloe

declined to renew his contract.  However, "temporal proximity is insufficient

in and of itself to establish that the employer's nondiscriminatory reason for

[the adverse action] was in fact pretextual."  *Skrjanc v. Great Lakes Power*

*Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001).  *See also Burks v. Yellow*

*Transp., Inc.*, 258 Fed. Appx. 867, 875 (6th Cir. 2008) (noting that temporal

proximity is generally used to show a causal connection in the context of a

retaliation claim, not an inference of pretext outside the context of a

retaliation claim).

Booth has failed to demonstrate that the reasons Defendants

provided for not renewing his contract are false, did not actually motivate

the decision, or were insufficient to motivate the decision.  The court will

grant summary judgment in favor of Defendants on Plaintiff's § 1981 claim.

II.   <u>First Amendment Retaliation</u>

To establish a claim of First Amendment retaliation, Plaintiff must prove that he (1) spoke on a matter of public concern; (2) the defendant took adverse action which would likely deter a person of ordinary firmness from engaging in that activity; (3) and there is a causal connection between the protected activity and the adverse action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Plaintiff must show that "the speech at issue represented *a substantial or motivating* factor in the adverse employment action. . . . We have interpreted this inquiry to mean that 'a motivating factor' is essentially but-for cause – 'without which the action being challenged simply would not have been taken.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citations and internal quotation marks omitted). Once the plaintiff has demonstrated that his protected conduct motivated the adverse action, the burden shifts to the defendant. *Id.* "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399.

Plaintiff alleges that his contract was not renewed in retaliation for his statements to Goodloe that he "didn't care for" his comments about Mexicans. Defendants argue that Plaintiff did not speak on a matter of

public concern and has not established a causal connection between his comments and his contract nonrenewal. Defendants' argument regarding the first element is not well taken, as opposition to racism on the part of a public employer is a matter of public concern. *See Matulin v. Village of Lodi*, 862 F.2d 609, 612 (6th Cir. 1988) (allegations of discrimination by a public employer implicate matters of public concern) *Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (noting that an employee's right "to protest racial discrimination," even privately to his employer, is "a matter inherently of public concern") (citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979)).

Plaintiff argues that his evidence of causation is largely the same as his evidence of pretext. ECF No. 24 at 26. As discussed above, however, Plaintiff's evidence of pretext consists primarily of the temporal proximity (about one and half months) between the time he made his comments and his contract non-renewal. "Substantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone." *Vereecke*, 609 F.3d at 400. "[O]ur case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory

motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." *Id.* at 401.

Viewing the totality of the circumstances, as detailed above, Plaintiff has not provided sufficient evidence of retaliatory motive. When Booth asked about his contract, Goodloe told Booth that he did not fit into the "culture" of the department and that he did not like Booth's schedule. *See* ECF No. 21-2 at 150-56. This conversation occurred *before* Booth told Goodloe that he did not care for Goodloe's comments about Mexicans. *Id.*; ECF No. 24-5 (Booth's handwritten notes). Goodloe considered not renewing Booth's contract before Booth's alleged protected conduct, thus diminishing the causal link between the protected conduct and adverse action.

More important, Defendants proffered legitimate, nonretaliatory reasons for not renewing Plaintiff's contract, which were not rebutted or shown to be pretextual by Plaintiff. The totality of the evidence does not permit an inference that the non-renewal of Plaintiff's contract was motivated by a desire to retaliate against him for exercising his First Amendment rights. The court will grant summary judgment in favor of Defendants on Plaintiff's First Amendment retaliation claim.

III.    <u>Municipal Liability</u>

In order to establish municipal liability, Plaintiff must demonstrate that (1) he was deprived of a constitutional right and (2) the municipality is responsible for that violation.  *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  As discussed above, Plaintiff has not established a constitutional deprivation.  Because Plaintiff has failed to demonstrate that his constitutional rights were violated by Goodloe, he cannot establish municipal liability.  *See Vereecke*, 609 F.3d at 404 ("Because the individual defendants did not violate his constitutional rights under the First Amendment, Vereecke cannot rely on their conduct to establish a claim of municipal liability.").

IV.    <u>Elliott-Larsen Claim</u>

Plaintiff also alleges a discrimination claim under Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*  Although the parties have not analyzed this claim, it parallels Plaintiff's § 1981 claim and will be dismissed for the reasons discussed above.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the Elliott-Larsen Act under the same standards as claims for race discrimination brought under Title VII of the Civil Rights Act of 1964.").

## ORDER

IT IS HEREBY ORDERED that Defendants' motion for summary judgment (ECF No. 21) is GRANTED.

Dated: March 10, 2020

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 9, 2020, by electronic and/or ordinary mail.

s/Brianna Sauve
Deputy Clerk

---